IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| TIMOTHY LEE JEMISON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 01-C-1282-W |
| | ) | |
| SERGEANT EUGENE JACKSON, | ) | |
| LIEUTENANT ERIC EVANS, and | ) | |
| COMMISSIONER MICHAEL HALEY, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OF OPINION

This is a civil action brought pursuant to 42 U.S.C. §1983, in which plaintiff, Timothy Lee Jemison, alleges that he has been deprived of rights, privileges, or immunities afforded him under the Constitution or laws of the United States of America. Plaintiff is an inmate of the State of Alabama, currently incarcerated at Bibb County Correctional Facility. As defendants, he has named Sgt. Eugene Jackson, Lt. Eric Evans, and Commissioner Mike Haley. As relief for the alleged violations, plaintiff seeks declaratory and injunctive relief, as well as monetary damages.

In response to the court's order for special report, defendants filed a special report accompanied by copies of an institutional incident report and the affidavits of Warden Cheryl Price, Sgt. Eugene Jackson, Lt. Eric Evans, and Commissioner Michael Haley. The defendants have also submitted a supplemental special report which included certified copies of plaintiff's medical record. By order of the court, the parties were advised that the defendants' special report and supplemental special report would be treated as a motion for summary judgment. Plaintiff was

advised that he must comply with Rule 56 of the *Federal Rules of Civil Procedure* in responding to the motion for summary judgment. Plaintiff has responded with a traverse.

Plaintiff complains that:

1. he has been assigned to a job which requires him to handle toxic chemical materials and hazardous waste without protective gear;

2. on at least one occasion Sgt. Jackson prevented him from going to the health care unit after he inhaled toxic fumes and also refused to let him use a prescribed arm sling;

3. Sgt. Jackson assaulted him on May 31, 2001, causing injuries which required medical attention; and,

4. Lt. Evans knew that Sgt. Jackson would not provide protective gear for him and failed to intervene to protect him.

## SUMMARY JUDGMENT STANDARD

In considering a motion for summary judgment, the court must determine whether the moving party is entitled to judgment as a matter of law. Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th

Cir. 1991). Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990), *cert. denied*, 498 U.S. 1103 (1991). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett v. Parker*, 898 F.2d at 1532 (citation omitted).

## DISCUSSION

In July, 2000, Jemison arrived at the Bibb County Correctional Facility from another institution. He claims that he was originally assigned to work as a law clerk "because of [his] experience in law." In mid-November, "the prison converted into a work camp/treatment camp and job applications were implemented for available jobs." On February 2, 2001, Sergeant Jackson "made death threats on [Jemison's] life and removed [him] from the computer as a law clerk and terminated [his] position as a law clerk" after pushing Jemison in the back. Jemison denies

provoking the assault, adding that it was without justification. On February 9, 2001, Jemison filed a complaint against Sergeant Jackson with Commissioner Haley and the personnel board in Montgomery.

On February 28, 2001, Sergeant Jackson retaliated against Jemison by assigning him to work in recycling under his direct supervision, despite the fact that Jemison did not submit a job application for that particular job. Jemison claims that he did not protest the job assignment, but requested protective gear "in compliance with The American National Standards Institute and Occupational Safety and Health because of the hazardous material involved." Sergeant Jackson, however, forced him to work in recycling "without the benefit of any protection whatsoever."

Jemison claims that from that day forward, a pattern of harassment continued. He alleges that he continued to request protective gear because he was being exposed to:

> barium sulfide powder (sulfur), liquid drain cleaners, various other industrial chemicals from used plastic containers, razor blades, bloody female tampons and sanitary tampons, bloody gauze, medical tubes, hypodermic needles and syringes, urine bags, disposable bed pads full of human feces, and a host of other hazardous things.

He claims that the more he demanded protective gear, "the more belligerent Sgt. Jackson became as his immediate supervisor Lieutenant Evans stood by laughing."

Jemison contends that during the week of April 16, 2001, he was overcome by barium sulfide from shaving powder that had been dumped on the processing table. He claims that it caused him breathing problems and strained the muscles on his right side and arm. Jemison asserts that he was prescribed pain pills and muscle relaxers and placed in an arm sling. However, Sergeant Jackson made him remove the arm sling and continue working, while Lieutenant Evans stood by shaking his head, joking, and laughing.

Jemison states that "sometime thereafter" he "started coughing up bloody mucus from [his] right lung and the doctor placed [him] on antibiotics, more pain pills and muscle relaxers and [he] had to consume about 28 pills a day."

On May 24, 2001, Jemison was too sick to work, but Sergeant Jackson sent for him around 7:30 a.m and ordered him to recycle trash. When Jemison arrived at the recycling facility, Sergeant Jackson separated him from the rest of the crew and ordered him to "process chemical plastic containers even though [he] informed [Jackson] that [he] was in severe pain and sluggish from all the medication [he] was on." Sergeant Jackson then ordered him to remove his arm sling and get to work. Jemison again demanded protective gear, but Sergeant Jackson refused to provide it, threatened to kill Jemison, then stated that he hoped the job would kill Jemison so he would not have to do it himself. Ten or fifteen minutes later, a mixture of paint thinner and bleach containers splashed all over Jemison's face, hair and arms, and caused him to choke on a toxic cloud. A day or so later, Jemison again wrote to Commissioner Haley "demanding that he stop the abuse and he failed to take any action."

On May 31, 2001, Sergeant Jackson ordered Jemison to report to the warehouse. Jemison claims that when he arrived at the warehouse, Jackson "made several death threats on [his] life, went into a rage and punched [him] in [the] stomach and commenced choking [him] while pulling [his] right injured arm behind [his] back, causing a snap in [his] right shoulder, then threatened [him] if [he] did not work." Jemison claims that the assault required medical attention, shoulder x-rays, more pain pills and muscle relaxers, and continued use of the arm sling. He adds that despite his medical condition, Sergeant Jackson continued to make him work every day until August 2, 2001.

On August 2, 2001, Sergeant Jackson had the cubical officer awaken Jemison to report to work. Because he was in so much pain, Jemison got back in bed and went back to sleep instead. When he was awakened again later, he refused to work without protective gear. Sergeant Jackson then handcuffed Jemison, threatened to kill him, then hit him in the face.

Jemison claims that on August 3, 2001, Jackson forced him to handle and recycle hazardous material, without the benefit of protective gear, while his shoulder was still injured. On this occasion, "something very toxic" burned his hands, arms, face, and eyes and caused respiratory problems, requiring him to go to the emergency room of the health care clinic. On August 10, 2001, at about 3:00 a.m., Jemison began having serious respiratory problems and dizziness. He was admitted into the emergency room of the health care unit at 6:15 a.m. He was discharged at 7:12 a.m., then forced to return to work at 7:30 a.m. He was again refused protective gear and forced to work without his arm sling.

On August 15, 2001, Jemison had a scheduled appointment with a doctor for "respiratory problems, right lung, right shoulder, right arm and spinal problems." However, Jemison was required to work the next day despite his medical problems. Sergeant Jackson took his arm sling, forcing Jemison to work with one arm, again without protective gear. Jemison was forced to handle toxic chemicals, which released hazardous gases, rendering him unable to breathe and further complicating his medical problems. Jemison claims that he was again forced to work with hazardous chemicals under the same conditions on August 20, 2001. This time, he nearly passed out. But, Sergeant Jackson refused to allow him to seek medical attention. He was finally admitted to the medical unit at 11:00 p.m. that night for respiratory problems, muscle spasms, and spinal problems.

Jemison adds that Sergeant Jackson forced him to work the following day, August 21, 2001, despite his worsening condition, and that Jackson threatened him again.

Jemison contends that for the next several weeks, "everyone including [himself] vigorously complained about the exposure to hazardous materials and requested protective gear in which Sgt. Jackson refused to provide." He wrote to Commissioner Haley again, but still got no response.

On September 6, 2001, while he was again being forced to work with one arm and no protective gear, the pain in Jemison's right side became unbearable. As a result, Jemison fell and a box full of mixed chemical containers landed in his face, splashing liquid drain cleaner into his eyes and face. He was rushed to the emergency room of the health care unit where he was treated by two or three nurses. He was discharged, but later readmitted upon doctor's orders. Jemison claims that he was removed from his job and seen by a doctor on September 10, 2001. The doctor prescribed him antibiotic eye ointment for two weeks and referred him to an eye specialist. He had a follow-up visit on September 12, 2001, then on October 12, 2001, an "eye doctor came and prescribed eye drops." He states that on October 25, 2001, he was transported for specialized treatment and placed on a different type of eye drops. On February 8, 2002, the "eye doctor returned and continued treatment with yet another type of eye drops and fitted corrective eye glass to help [his] vision."

### *Dangerous Job Assignment*

The centerpiece of plaintiff's lawsuit is his claim that being required to work in the recycling department amounts to cruel and unusual punishment in violation of the Eighth Amendment to the Constitution. Plaintiff claims that he is being required to handle toxic chemical materials and hazardous waste as part of his prison job assignment and is not being provided any protective gear.

7

Because "[p]rison inmates can be required to work," a "work assignment alone does not rise to a constitutional violation." *Mendoza v. Lynaugh*, 989 F.2d 191, 194 n.4 (5th Cir. 1993). However, there are certain circumstances in which prison work requirements can constitute cruel and unusual punishment. *See Madewell v. Roberts*, 909 F.2d 1203 (8th Cir. 1990); *Sampson v. King*, 693 F.2d 566 (5th Cir. 1982).

> [F]or prison officials knowingly to compel convicts to perform physical labor which is beyond their strength, or which constitutes a danger to their lives or health, or which is unduly painful constitutes an infliction of cruel and unusual punishment prohibited by the Eighth Amendment.

*Franklin v. Banks*, 979 F.2d 1330, 1332 (8th Cir. 1992) (*quoting Ray v. Mabry*, 556 F.2d 881, 882 (8th Cir. 1977)).

In order to constitute cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety. *Whitley v. Albers*, 475 U.S. 312, 319, 106, S.Ct. 1078,1084, 89 L.Ed.2d. 251 (1986). Obduracy and wantonness rather than inadvertence or error in good faith characterize the conduct prohibited by the Eighth Amendment. *Id.* Plaintiff claims he is forced to handle hazardous materials without protective gear and has suffered several injuries as a result. Sgt. Jackson responded to plaintiff's complaint by stating that inmates who work on the recycling detail sort the trash that is generated inside the facility and remove aluminum, cardboard and other recyclable material. Rubber gloves are available for inmates who want to wear them. (Doc.#39 Exh.B).

Plaintiff describes several accidents he has had with cans or bottles that had been thrown in the trash before they were completely empty. On one occasion a can of shaving powder was thrown on the processing table and plaintiff inhaled some of the powder. Plaintiff claims that the fumes caused him to experience breathing problems and strained a muscle on his right side and arm.

(Doc.#24 p 5). On May 24, 2001, plaintiff was sorting plastic containers and "a mixture of paint thinner and bleach containers splashed all over my face, hair, and arms." On August 3, 2001, plaintiff was burned by something in the trash and had to go the health care unit for treatment. On August 20, 2001, plaintiff claims he was overcome by gases and was admitted to the health care unit late that night for respiratory problems, muscle spasms, and spinal problems. On September 6, 2001, plaintiff reports that he fell and when he did, a box of trash fell on him and splashed drain cleaner in his eyes. (Doc.#24).

In his sworn response, Sgt. Jackson disputes plaintiff's claim that he was exposed to toxic chemicals, or dangerous materials. However, the court must consider the "specific facts" set out in the plaintiff's sworn complaint when reviewing a defense motion for summary judgment and must accept as true the plaintiff's description of the event. *Perry v. Thompson*, 786 F.2d 1093, 1094 (11th Cir. 1986). Accordingly, the court cannot say at this time that plaintiff's claim that Sgt. Jackson was deliberately indifferent to his personal safety by assigning him to a job handling dangerous materials without adequate protective gear, should be dismissed. On this issue, as against Sgt. Jackson, the motion for summary judgment must be denied.

To the extent plaintiff is complaining about the requirement that he work while incarcerated, he fails to state a claim of constitutional proportion, as there is no constitutional prohibition against requiring an inmate to work. When the population of the BCCF was increased in 2000, a job application procedure was implemented. Plaintiff complains that he did not apply to work in the recycling department and the job board never interviewed him for that job so the defendants have no authority to require him to work there. Courts have held that compelling convicted prisoners to

work is not a violation of the Thirteenth Amendment. In *Omasta v. Wainwright*, 696 F.2d 1304 (11th Cir. 1983), the Court of Appeals for the Eleventh Circuit said:

> [W]here a prisoner is incarcerated pursuant to a presumptively valid judgment and commitment order issued by a court of competent jurisdiction and is forced to work pursuant to prison regulations or state statutes, the thirteenth amendment's prohibition against involuntary servitude is not implicated.

696 F.2d at 1306.

*See also Mosley v. Mabry*, 697 F.2d 213 (8th Cir. 1982).

The nature of work to which a prisoner is assigned is a matter of prison administration within the discretion of prison officials. *Altizer v. Paderick*, 569 F.2d 812 (4th Cir.), *cert. denied*, 435 U.S. 1009 (1978). "The Department of Corrections is authorized to direct inmates to work at any labor and at any site . . ." Ala. Code § 14-3-47 (1985).

To the extent plaintiff is complaining that defendants failed to follow a routine or procedure when they removed him from his job as a law clerk and reassigned him to the recycling detail, he fails to state a constitutional claim. The mere fact that agency regulations or procedures have been violated does not by itself raise a constitutional issue. *United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979); *Caruth v. Pinkney*, 683 F.2d 1044 (7th Cir. 1982); *Dowdy v. Johnson*, 510 F.Supp. 836, 838 (E.D. Va. 1981). Likewise, plaintiff cannot claim a constitutional violation based on a theory that defendants violated state law. *Colon v. Schneider*, 899 F.2d 660 (7th Cir. 1990).

Plaintiff also claims that Sgt. Jackson assigned him to the recycling force in retaliation for filing a complaint with Commissioner Mike Haley and the Personnel Board about him. By affidavit, Sgt. Jackson states that the institutional job board assigned plaintiff to the recycling detail. Plaintiff has not submitted any facts to show that Sgt. Jackson was in any way responsible for assigning him

to that job. Conclusory allegations that lack an underlying factual basis are insufficient to withstand a motion to dismiss. *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir. 1981), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed. 2d 96 (1983). Plaintiff's claim that Sgt. Jackson assigned him to the recycling job in retaliation for his earlier actions is due to be dismissed.

### *Qualified Immunity*

In addition to specifically denying plaintiff's claim that he exposed the plaintiff to a dangerous situation without adequate protective gear, the defendants maintain that this claim should be dismissed on the grounds that they are entitled to qualified immunity because their actions were of a discretionary nature. Government officials exercising a discretionary function are entitled to qualified immunity from damages unless their acts or decisions contravene clearly established constitutional or statutory rights of which a reasonable official should have knowledge. *See Mitchell v. Forsyth*, 472 U.S. 511 (1985); *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). The "contours of the rights must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 636, 641 (1987). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). As the Eleventh Circuit has explained, "[f]or qualified immunity to be surrendered, pre-existing law must dictate, that is truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates the law *in the circumstances*." *Lassiter v. Alabama A & M Univ.*, 28 F.3d 1146, 1150 (11th Cir. 1994) (en banc) (emphasis in original), *quoted in McCoy v. Webster*, 47 F.3d 404, 407 (11th Cir. 1995). Once a defendant establishes that the act or decision complained of was within his discretionary function, the burden of proof shifts to the plaintiff to demonstrate that defendant

violated clearly established constitutional law. *See Sammons v. Taylor*, 967 F.2d 1533 (11th Cir. 1992) (citing *Zeigler v. Jackson*, 716 F.2d 847 (11th Cir. 1983)); *McCoy v. Webster*, 47 F.3d at 407.

It is undisputed that the defendant officers are state employees and the decisions they made in their jobs as correctional officers were within the discretionary authority granted by that position. The constitutional right allegedly violated by the defendants, the right of the plaintiff to be free of cruel and unusual punishment from those who guard him, was clearly established at the time of the alleged actions of Sgt. Jackson. Requiring plaintiff to sort hazardous materials or containers containing toxic chemicals without providing adequate protective gear could rise to the level of cruel and unusual punishment in violation of the Eighth Amendment and Sgt. Jackson is not entitled to qualified immunity.[1]

*Medical Care*

Plaintiff complains that on May 24, 2001, Sgt. Jackson made him work when he was sick, denied him medical treatment when he inhaled toxic fumes, and refused to allow him to use a medically prescribed arm sling.

Plaintiff states that he went to the health care unit during the night of August 10, 2001, and was too sick to work the next day, but Sgt. Jackson forced him to start working at 7:30 a.m. anyway. Plaintiff also alleges that more than once Sgt. Jackson made him remove a prescribed arm sling and continue working. The first time was after the shaving powder incident on April 16, 2001. The next time was on May 24, 2001. On August 16, 2001, Sgt. Jackson took the arm sling and forced plaintiff to work without it. Sgt. Jackson responded to plaintiff's allegations by stating that plaintiff refused

---

[1] Defendants who are not successful with their qualified immunity defense before trial can re-assert it at the end of plaintiff's case in a Rule 50(a) motion. *Johnson v. Breeden* 280 F.3d 1308 (11th Cir. 2002), citing *Cottrell v. Caldwell*, 85 F.3d 1480, 1488 (11th Cir. 1996).

to report to work on August 2, 2001, and disciplinary action was initiated against him. Sgt. Jackson specifically denies provoking, assaulting, or threatening plaintiff.

In response to the defendants' special report plaintiff submitted three prescriptions for an arm sling and two for work stops. On May 2, 2001, Nurse Hall gave plaintiff a work stop for two days and permission to have an arm sling for seven days, May 2, 2001, to May 8, 2001. On May 10, 2001, Nurse Hall gave plaintiff permission to have an arm sling for one week May 10, 2001, to May 17, 2001, and on June 4, 2001, plaintiff was given a seven day work stop and permission to have an arm sling from June 4, 2001, to June 10, 2001. The days plaintiff complains he was required to work when he was ill or work without a prescribed arm sling, do not coincide with the work stop profiles and permission to wear an arm sling health slips that he submitted in his traverse. (Doc.#41 Exh. F, G, and H). Plaintiff has failed to submit facts to show that he had been give a work stop slip or an arm sling permission slip for the days he complains Sgt. Jackson disregarded his conditions, and made him work. Plaintiff's complaint is due to be dismissed.

In his attempt to persuade the court that he has been subjected to a dangerous job plaintiff reports the many occasions on which he became ill, sought medical treatment, and was provided tests, evaluations, medication, and medical appliances. The defendants submitted a copy of plaintiff's extensive medical record which shows that the medical staff responded to plaintiff's numerous complaints and provided extensive treatment for hypertension, colds, rashes, blurred vision, dry eyes, and muscle strains. Nothing in the medical record supports plaintiff's claim that his health has been effected by his prison job assignment. Plaintiff was complaining of vision problems prior to his job assignment in recycling, and reported to a psychiatrist that his problems started when he fell and suffered a head injury while in the Navy in 1979. Plaintiff was treated for

his various complaints, after he accidentally spilled household items and cleaning products on himself, but there is no evidence that the exposure caused any permanent health problems.

## *Excessive Force*

On May 31, 2001, Sgt. Jackson ordered plaintiff to report to the warehouse for work. When plaintiff arrived Jackson threatened him, then punched him in the stomach, choked him, pulled on his injured arm, and threatened him again if he did not start working.(Doc. #24 p.6). Plaintiff states that the assault required x-rays of his shoulder, pain pills, muscle relaxers and continued use of an arm sling.

The Eighth Amendment prohibition against cruel and unusual punishment is triggered when a prisoner is subjected to an "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). The Supreme Court held in *Hudson v. McMillian*, 503 U.S. 1, 6-7,112 S. Ct. 995 (1992), that "whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry [in determining whether a prisoner has suffered unnecessary and wanton pain] is that set out in *Whitley*: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." 112 S. Ct. at 999. In extending *Whitley* to all cases involving allegations of force, the Court reasoned:

> Many of the concerns underlying our holding in *Whitley* arise whenever guards use force to keep order. Whether the prison disturbance is a riot or a lesser disruption, corrections officers must balance the need "to maintain or restore discipline" through force against the risk of injury to inmates. Both situations may require prison officials to act quickly and decisively. Likewise, both implicate the principle that "'[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'"

*Id.* at 998-9 (citations omitted). With these concerns in mind, the Court set out certain factors that should be considered in evaluating whether the use of force was wanton and unnecessary. They include: 1) the need for the application of force; 2) the relationship between the need and the amount of force used; 3) the threat reasonably perceived by the prison official; 4) any efforts made to temper the severity of a forceful response; and 5) the extent of the injury suffered by the inmate. The *Hudson* Court made it clear that the extent of injury suffered by the inmate is only one of the many factors which should be considered, not a decisive one when it said, "[t]he absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it." *Id.* at 999.

As against Sgt. Jackson material facts surrounding plaintiff's claim of an unnecessary use of force remain in dispute thus precluding summary judgment. Plaintiff claims that Sgt. Jackson went into a rage and punched him in the stomach then choked him and pulled his injured arm behind his back. Sgt. Jackson has submitted a sworn denial of plaintiff's allegation, but summary judgment is not the procedure for resolving a swearing match. The claims of the parties require a determination of whether the defendant acted in good faith to restore order and discipline, or maliciously and sadistically for the very purpose of causing harm. *See Whitley v. Albers*, 475 U.S. 312 (1986); *Wilson v. Seiter*, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed. 2d 271 (1991). That calls for the fact-finder to examine several factors, including the need for the application of force, the amount of force used in relation to the need, the restraint used in the application of force, and the extent of injuries suffered. Consequently the court cannot say that Sgt. Jackson is entitled to judgment as a matter of law, and the motion for summary judgment on the excessive force claim must be denied.

### *Lt. Evans and Mike Haley*

Plaintiff names Lt. Evans and Mike Haley as defendants, but has not alleged that either of them were personally involved in the incidents about which he complains. Plaintiff simply attempts to implicate Lt. Evans and Commissioner Haley through the concept of *respondeat superior*. However, "[t]here is no *respondeat superior* liability under § 1983." *Harris v. Ostrout*, 65 F.3d 912, 917 (11th Cir. 1995) (*citing Monell v. Department of Social Services*, 436 U.S. 658, 690-92 (1978) and *LaMarca v. Turner*, 995 F.2d 1526, 1538 (11th Cir. 1993), *cert. denied*, 510 U.S. 1164 (1994). Supervisory personnel may be held accountable for the constitutional violations of their subordinates upon proof that they (1) were directly involved in the wrongdoing; (2) failed to remedy a wrong after learning of it through report or appeal; (3) created or allowed a policy under which the violation occurred; or (4) were grossly negligent in managing the subordinates who caused the wrongdoing. *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir. 1986). Absent some allegation that Lt. Evans and Mike Haley knew of, sanctioned, participated in or was otherwise "affirmatively link[ed]" to the acts here complained of, the claim against defendants Evans and Haley are insufficient to state a cause of action under 42 U.S.C. § 1983. Accordingly, this action is due to be dismissed as to defendant Lt. Eric Evans and Commissioner Michael Haley.

Accordingly, for the reasons stated above, the court concludes that the defendants' special report should be treated as a motion for summary judgment and, as such, DENIED as to plaintiff's claim that Sgt. Jackson required him to perform a dangerous job without the proper protective gear and that Sgt. Jackson assaulted him. Additionally, the motion for summary judgment filed on behalf of Lt. Eric Evans, and Commissioner Michael Haley is due to be GRANTED and they are due to be DISMISSED WITH PREJUDICE.

A separate final judgment consistent with this Memorandum of Opinion will be entered contemporaneously herewith.

DONE this the 23rd day of September, 2003.

U. W. CLEMON
CHIEF UNITED STATES DISTRICT JUDGE